**INDIANA INSURANCE COMPANIES, Plaintiff,**

v.

**GRANITE STATE INSURANCE COMPANY, Defendant.**

**No. IP 86–650–C.**

United States District Court,
S.D. Indiana,
Indianapolis Division.

May 2, 1988.

Defendant's Motion for New Trial Denied July 13, 1988.

Plaintiff's Motion to Amend Granted July 13, 1988.

Stephen Hensleigh Thomas, Statham McCray Thomas & Krahn, Charles C. Griffith, Johnson Carrol & Griffith, P.C., Evansville, Ind., for plaintiff.

George V. Heins, Smith Maley & Douglas, Indianapolis, Ind., for defendant.

## MEMORANDUM ENTRY

TINDER, District Judge.

This cause comes before the court upon a declaratory judgment action filed by the plaintiff, Indiana Insurance Companies (Indiana) against the defendant, Granite State Insurance Company (Granite State). Indiana is seeking contribution from Granite State for a personal injury settlement arising out of a swimming pool accident. A court trial was held on January 15, 1988. Additionally, both parties submitted trial briefs, post-trial briefs and reply briefs. The court having reviewed the briefs submitted by the parties and the evidence submitted at trial now finds that the defendant, Granite State, provided insurance which is applicable in this case and finds that Indiana is entitled to contribution from Granite State for settlement in the amount of Five Hundred Thousand Dollars ($500,-000) and for one half of the attorney's fees and expenses associated with the defense of the underlying claim, namely Eight Thousand Four Hundred and Seven Dollars ($8,407). In accordance therewith, the court submits the following findings of fact and conclusions of law.

### Findings of Fact

1. Paul and Robert Hatfield, d/b/a Hatfield and Hatfield Associates (Hatfields), were the general contractors for the construction of the Regency Apartment Complex in Evansville, Indiana, including both the indoor and outdoor swimming pools.

2. The Hatfields owned and managed the Regency Complex from the time of its completion until July 1, 1983, when it was sold to Regency Associates.

3. In accordance with the sale, the Indiana policy denominated as 42–012–484 which provided comprehensive general liability insurance on the complex and had previously been issued to the Hatfields was amended to substitute Regency Associates as the named insured.

4. Pursuant to an agreement, the Hatfields continued as managers of the apartments after the sale and as such were additional insureds under the Indiana policy.

5. The Indiana policy provided comprehensive general liability insurance with limits of liability of $1,000,000.

6. Granite State issued policy number POP 280–2239 to the Hatfields which provided comprehensive general liability coverage with liability limits of $500,000 and included completed operations coverage. This policy was in effect both at the time of the sale and the accident.

7. On August 2, 1983, Donnie Ray Snider, II was a guest at the Regency Apartment Complex. Snider was involved in an accident in which he struck his head on the bottom of the outdoor swimming pool. He sustained severe personal injuries resulting in quadraplegia.

8. In September, 1983, Diane M. Snider, as Guardian of Donnie Ray Snider, II filed suit against the Hatfields in both their capacity as general contractors and as managers of the Regency Complex and against Regency Associates as owners of the apartment complex.

9. Although the theories of the pleadings are commingled, Snider alleged negligence in design, construction, maintenance and operation of the swimming pool in her complaint; thus, the Hatfields had claims filed against them which were separate and distinct from the claims of negligent maintenance and operation, concurrently alleged against the owners.

10. Upon the filing of the claim the Hatfields and Regency Associates notified their insurance agent, Phil Heston, of the accident and the claim. Mr. Heston was the agent who sold both the Indiana and the Granite State policy; thus, he notified both companies of the claim.

11. In September, 1983, Indiana retained counsel to represent Regency Associates and the Hatfields in their capacity as insureds, owner and manager respectively, under the Indiana policy.

12. Granite State assigned this file to Tom Bell an independent insurance adjuster for investigation. Mr. Bell and the Indiana representative discussed the case. Indiana's position was that Granite State had pro-rata coverage. Mr. Bell disagreed with the Indiana position and stated that if there was coverage under the Granite State policy it would be "excess at best." There is some evidence in the record that Mr. Bell was given periodic updates on the progress of the litigation and presumably he passed the information on to Granite State.

13. Granite State requested that Mr. Bell submit the file to the Indianapolis law firm of Smith, Maley and Douglas for a coverage opinion in March, 1984. The record reflects that there was some delay in getting all documents which defense counsel requested to formulate a coverage opinion to Granite State's attorney; however, the documents were provided at some point in April, 1985.

14. In early November, 1985, Indiana began serious settlement negotiations with Snider, as discovery had been completed and the case was set for trial in January, 1986. Indiana contacted representatives of Granite State to again formally request participation in evaluation and settlement of the claim.

15. On November 8, 1985, the Hatfields made a demand on Indiana to settle the claim, because of the perceived potential for excess personal exposure.

16. On November 11, 1985, Smith, Maley and Douglas advised Granite State of its opinion that the Granite State policy did not afford coverage to this claim.

17. On November 13, 1985, Granite State notified its named insureds, the Hatfields, that they had no coverage for the claim arising from the August 2, 1983, swimming pool accident under the Granite State comprehensive general liability policy. The record is silent as to any prior notice from Granite State to its insureds that there was a coverage issue.

18. In an attempt to effectuate settlement, Granite State and Indiana entered into an agreement whereby Granite State agreed to the reasonableness of the settlement in the amount of $1,000,000, waived the claim that Indiana was acting as a volunteer, and agreed to negotiate or litigate the coverage issue in a contribution action after settlement was finalized.

19. At the trial of this case, the parties stipulated that the attorney's fees generated by Indiana in the defense of the underlying claim were reasonable. In addition, the parties stipulated that in the event that Granite State was found to have provided concurrent coverage to the Snider claim and contribution was ordered, Granite State would be responsible for one half of the fee arising out of its co-existing duty to defend.

20. In January, 1986, the Snider claim was settled for $1,000,000. The settlement was structured such that the plaintiff received $750,000 at the time of the settlement, with the other $250,000 contingent upon the outcome of the contribution action.

21. On May 20, 1986, Indiana filed this declaratory judgment action, seeking contribution from Granite State for the settlement of the Snider personal injury claim, and for attorney's fees and costs associated with the defense of the Snider claim.

22. Any finding of fact stated above, to the extent that it constitutes a conclusion of law, is herein incorporated by reference as an additional conclusion of law by the court.

### Conclusions of Law

1. Granite State's denial of coverage in this case was erroneous. When the Hatfields sold the Regency Apartment Complex on July 1, 1983, it became a completed operation and a new exposure under the Granite State policy. Granite State's policy provides for a 90–day period of automatic coverage for newly-created exposures arising during the effective dates of the policy. Snider's accident occurred on August 2, 1983, a date well within the period of automatic coverage. Snider's complaint asserted a claim for negligent design and construction of the swimming pool, which remained pending at the time of settlement. Such a claim falls squarely within the Completed Operations Coverage of the Granite State policy. Granite State's insurance policy affords coverage to the Snider claim pursuant to its automatic coverage provision for newly-created exposures.

2. Even if the sale of the complex did not create a new exposure subject to automatic coverage, Granite State still cannot deny coverage in this case. Granite State relies on the "Description of Hazards" section of the declaration sheet and a phrase printed directly beneath it as its sole basis for denying coverage, asserting that the phrase constitutes an exclusion. However, the phrase is ambiguous in its use of the term hazard. Therefore, it is ineffective as an exclusion and it does not defeat coverage for the Snider claim under the Granite State policy.

3. Indiana has satisfied the prerequisites for contribution in this case. The right of contribution exists between two insurance companies providing concurrent coverage if the policies cover (1) the same parties, (2) in the same interest, (3) in the same property, (4) against the same casualty. Both the Indiana policy and the Granite State policy afford coverage to the Hatfields, the same party, in the same property, the Regency Apartment Complex. In addition, both policies insure the same interest, the safety of those who might bring suit against the insured because of an accident occurring at the Regency Complex. In other words, the insurable interest under both policies is an idemnity interest for any liability claims arising out of the complex.

Finally, the policies both cover the same casualty. The identity of casualty or risk does not require identity of coverage under the policy. Rather, it requires that with respect to the harm suffered, there be coverage under both policies. The court has determined that the Completed Operations Coverage in the Granite State policy affords coverage for Snider's claim against the Hatfields for negligent design and construction. After settlement, the court is permitted to assume that the plaintiff could have been successful on any claim still pending at the time of settlement; there-

fore each insurer's exposure is identical, in that the settlement cannot be apportioned among the theories. Each policy covers the same casualty or risk, that of liability for injuries to a third person, resulting from an accident at the Regency Apartment Complex. Indiana has satisfied all of the requirements for contribution in this case and is entitled to receive contribution from Granite State for the settlement of the claim and for attorney's fees and costs associated with defending the Snider claim.

4. The agreement between Regency Associates and the Hatfields for the sale of the apartment complex allocated the risks common to the owner, Regency Associates, and the managers, the Hatfields, to Indiana for the mutual benefit of the parties to the agreement. However, the agreement does not foreclose the contribution action in this case.

Snider asserted a claim of negligent design and construction against the Hatfields exclusively, as the general contractors of the complex. This risk is an independent exposure, wholly distinct from the common exposures allocated by the agreement to Indiana. The Hatfields purchased the Granite State policy to protect themselves from personal liability for claims not covered by other insurance. The case law cited by the defendant cannot be construed so broadly as to prohibit contribution from an insurance company that received a premium to provide coverage to a risk which fell exclusively upon its insureds. The agreement in this case serves to allocate common risks; however, it does not foreclose contribution from another insurance company affording coverage to a separate and distinct exposure arising out of a single accident.

5. Indiana is entitled to contribution by equal shares for the personal injury settlement of the Snider claim and for attorney's fees and costs associated with the defense of the Snider claim. The Snider claim was settled for $1,000,000, pursuant to the "other insurance" clause of both policies Granite State must contribute $500,000. In addition, Granite State is responsible for one half of the attorney's fees and costs associated with defending the Snider claim, namely $8,407.

6. The plaintiff sought recovery of the attorney's fees associated with the contribution action. However, the plaintiff provided no authority for such a recovery in this instance. The general rule with respect to the award of attorney's fees, the American Rule, provides that the prevailing litigant is ordinarily not entitled to collect a reasonable attorney's fee from the loser, absent a statutory basis for the award or a private agreement to the contrary. In this case, nothing was offered to support a fee award for the contribution action. Consequently, the court *sua sponte* granted summary judgment on this aspect of the fee recovery claim.

7. Any conclusion of law stated above, to the extent that it constitutes a finding of fact, is herein incorporated by reference as an additional finding of fact by the court.

### Discussion

Indiana instituted this declaratory judgment action, seeking contribution from Granite State for a personal injury settlement of $1,000,000. Donnie Ray Snider, II (Snider) was a guest at the Regency Apartment Complex on August 2, 1983. Snider was involved in an accident in which he struck his head on the bottom of the outdoor swimming pool. He sustained severe personal injuries resulting in quadraplegia. In September, 1983, Snider's guardian, Diane M. Snider, instituted an action against Paul and Robert Hatfield (Hatfields) in their capacity as general construction contractors and resident managers of the Regency Complex and against Regency Associates in their capacity as the complex owners.

The Hatfields were general contractors for the construction of the Regency Apartment Complex in Evansville, Indiana, including the swimming pools. They owned and managed the complex from the time of completion until the complex was sold on

July 1, 1983, to Regency Associates. Regency Associates and the Hatfields entered into an agreement whereby the Hatfields would continue to manage the complex. Pursuant to the terms of the sale, the comprehensive general liability insurance policy which the Hatfields had purchased from Indiana to cover the complex was amended to substitute Regency Associates as the named insured. The Hatfields continued to be additional insureds under the Indiana policy, because they remained as managers of the complex. The limits of liability for the comprehensive general liability policy provided by Indiana in this case are $1,000,000.

Granite State issued a comprehensive general liability insurance policy to the Hatfields which included among its coverages completed operations coverage. The liability limits for the Granite State policy are $500,000.

After the claim was filed by Snider against the Hatfields and Regency Associates, the Hatfields notified Phil Heston, the agent who sold both the Indiana and Granite State policies, of the claim and asked that Heston notify the respective insurance companies of the claim. Each company was duly notified and Indiana hired counsel to defend its insureds, Regency Associates and the Hatfields, in their capacity as managers of the Regency Complex. Granite

State hired an independent adjuster, Tom Bell, to investigate the claim. Indiana's position was that Granite State had pro-rata coverage on the claim. Mr. Bell did not agree with Indiana's position and he asserted that if any coverage existed under the Granite State policy, it was excess coverage.

In March, 1984, at the request of Granite State, Mr. Bell submitted the file in this case to the law firm of Smith, Maley and Douglas for a coverage opinion. In November, 1985, serious settlement negotiations were pursued by Indiana, after the Hatfields made a demand to settle the case because of a perceived potential for excess personal exposure. The law firm hired by Granite State to provide a coverage opinion informed Granite State on November 11, 1985, of its opinion that the policy did not afford coverage to the Snider claim. Granite State informed its named insured, the Hatfields, that coverage was denied on November 13, 1985. In an attempt to effectuate settlement, Indiana and Granite State entered into an agreement where Granite State agreed to the reasonableness of the settlement, waived the claim that Indiana was acting as a volunteer and agreed to litigate the contribution claim after settlement was reached. The Snider claim was settled for $1,000,000 in January, 1986.[1]

Indiana instituted this action in May, 1986, asserting that Granite State provided

---

1. Defendant has argued that the settlement of the Snider claim cannot properly be characterized as a $1,000,000 settlement, because Snider agreed to accept $750,000 with the other $250,000 contingent upon a successful contribution action. The fact of whether the settlement was structured and contingent upon the happening of an event is of little consequence in this case. Granite State agreed that $1,000,000 was a reasonable settlement of the Snider claim. Nothing in the evidence suggests that Granite State would not have agreed to this type of settlement and in fact this kind of an agreement is commonplace in the insurance industry.

If Granite State took issue with this type of arrangement the time for the company to raise its concerns was at the time the company agreed to the reasonableness of a $1,000,000 settlement of the Snider claim. At the time that Granite State agreed to the reasonableness of a $1,000,000 settlement, the company had the opportunity and the obligation to take whatever

steps it considered necessary to protect its interests. Indiana made every attempt to ensure Granite State's participation in the settlement of the claim. However, Granite State chose to refrain from such participation. The time for Granite State to take issue with the settlement was at the time it was being formulated. Granite State gave its general approval to a $1,000,000 settlement of the Snider claim and then failed to take any other action. The company is now estopped from arguing that it did not agree to the terms and conditions of the settlement, because its inaction during the time that the settlement was being formulated essentially constitutes a waiver of any objections to the negotiated settlement at this time.

Finally, the contingent nature of the settlement of the Snider claim is essentially a distinction without a difference. When Granite State agreed to the reasonableness of a $1,000,000 settlement and agreed to litigate contribution, the company knew that its maximum exposure would be $500,000 pursuant to the "other insur-

concurrent coverage in this case and thus, that Granite State must contribute an equal share of the settlement, defense costs, and expenses. Granite State maintains three primary arguments, first that its policy does not provide coverage for the Snider claim; second, that Indiana has not satisfied the prerequisites for contribution; and third, even if the policy provides coverage to the Snider claim, that under Indiana precedent contribution is foreclosed, in that the risk was allocated and accepted by an insurance company for the benefit of both parties to the agreement and that company is prohibited from seeking contribution from the negligent party's insurance company. The court does not find merit in the defendant's arguments; however, each argument will be addressed.

## I. Coverage Dispute

### A. Newly–Created Risks Under the Completed Operations Coverage

■ Granite State maintains that the completed operations coverage provided in its comprehensive general liability policy covering the Hatfield's construction and development business does not apply in this case. Defendant alleges that the risk herein is excluded from the coverage because of certain language located at the bottom of the declaration sheet which provides: "as respects comprehensive general liability insurance, the foregoing [Description of Hazards] discloses all hazards insured hereunder known to exist at the effective date of this policy, unless otherwise stated herein." See Exhibit A. (A copy of the Declarations Sheet.) The Description of Hazards portion of the declaration sheet which immediately precedes the above-quoted material describes the hazards of the Completed Operations Coverage as "carpentry in the construction of detached private residences for occupancy by one or two families and private garages in connection therewith." See Exhibit A. Granite State asserts that the risk in this case existed at the inception of the policy and that its omission from the Description of Hazards operates as an exclusion.

Indiana maintains that the provision allegedly excluding the Snider claim is ineffective, because the risk herein was a newly-created risk which was automatically covered under the terms of the policy. The apartment complex was sold by the Hatfields to Regency Associates on July 1, 1983. At that point the apartment complex became a completed operation and consequently a new exposure under the Granite State policy. Coverage is automatically afforded to such newly-created risks under the policy for a period of ninety (90) days. After that time period, the insured must report the new risk to the company.

In this case, the apartment complex was sold on June 1, 1983. The Snider accident occurred on August 2, 1983, a date well within the 90–day period of automatic coverage. Comprehensive general liability insurance and its constituent completed operations coverage provide a broad spectrum of coverage which encompasses all risks falling with the coverage not specifically excluded. It differs from other forms of insurance, in that it is not a scheduled liability policy. Completed operations coverage is designed to protect the insured from liability arising from the insured's completed work. Nat'l Underwriter Co., *Comprehensive General Liability Insurance*, Fidelity, Casualty and Surety Bulletin (June, 1985).[2] The comprehensive general liability policy purchased by the Hatfields was designed to protect against risks associated with their construction and de-

---

ance" provisions of both policies. In agreeing to the $1,000,000 Granite State accepted a potential exposure of $500,000. The fact that Snider agreed to accept only partial payment has not prejudiced Granite State in any way. In fact, its position was not changed at all. Therefore, the contingent nature of the settlement is of little significance in this case, and it in no way alters the respective obligation of Indiana and Granite State.

2. The parties stipulated that the Fire, Casualty and Surety Bulletin is considered an authoratative source in the insurance industry.

velopment business. The Granite State policy provides in part that a completed operations hazard:

> includes bodily injury and property damage arising out of operations or reliance upon a representation or warranty made at any time with respect thereto, but only if the bodily injury or property damage occurs after such operations have been completed or abandoned and occurs away from premises owned by or rented to the named insured. "Operations" include materials, parts or equipment furnished in connection therewith. Operations shall be deemed completed at the earliest of the following times:
>
> > (1) when all operations to be performed by or on behalf of the named insured under the contract have been completed.
> >
> > (2) when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed, or
> >
> > (3) when the portion of the work out of which the injury or damage arises has been put to its intended use by any person or organization other than another contractor or subcontractor engaged in performing operations for a principal as a part of the same project.

One such risk was the Regency Apartment Complex in Evansville, Indiana.

The Hatfields were the general construction contractors of the complex and the pool, as well as the managers of the complex. The Snider claim included separate and distinct allegations of negligence raised against the Hatfields in their capacity as builder/developers, asserting negligence in the design and construction of the pool. The Granite State policy automatically afforded coverage for new exposures arising during the effective period of the policy. At the point when the complex was sold, it became a completed operation, and as such, a new exposure which Granite State agreed to insure for a 90–day period automatically. The accident in this case occurred within the period of automatic coverage; therefore, it falls within the coverage provided by the Granite State policy and Granite State's denial of coverage was erroneous.

## B. Ambiguity in the Purported Exclusion

■ Even if the sale of the complex did not create a new risk under the completed operations coverage, the court must consider whether or not Granite State can rely on the language printed on the bottom of the declaration sheet to defeat liability in this instance. A comprehensive general liability policy is an expansive policy designed to provide the insured with a broad range of coverage. As with any other insurance, an exclusion must be clear and unambiguous before it is effective to exclude coverage under a comprehensive liability policy. Therefore, the court must examine the phrase, which Granite State purports to rely on in its assertion that coverage for the Snider claim is excluded, to determine if it rises to the level of an exclusion.

The phrase provides: "as respects comprehensive general liability insurance, the foregoing discloses all hazards insured hereunder known to exist at the effective date of the policy, unless otherwise stated herein." The defendant maintains that the risks associated with the Regency Complex are excluded, because they are not enumerated in the "Description of Hazards." However, the testimony of plaintiff's underwriting expert, Richard Woolman, demonstrates the flawed reasoning of this argument. A comprehensive general liability policy differs from other forms of insurance policies, in that it is not a scheduled liability policy. Rather, it is a policy providing a broad spectrum of coverage which encompasses all risks falling within the guidelines of the coverage not specifically excluded. Therefore, according to Mr. Woolman it is not unusual for a covered risk not to be included in the description of hazards portion of the declaration sheet, as the description of hazards is a rating device rather than a schedule of covered risks.

The merit of this position is reinforced in light of the insurance company's right to conduct an audit to determine the actual exposures for a premium period and with that information to modify the premium charged. That is, with a comprehensive general liability policy, the insured pays what is considered a deposit premium and at the end of the period the company is permitted to ascertain the actual premium base, retrospectively, and to change it according to actual exposure.

Further, the language on the declaration sheet does not create an exclusion, because it is ambiguous. A policy of insurance is ambiguous, "if reasonably intelligent people may honestly differ as to the meaning of the policy language." *Hitt v. Githens*, 509 N.E.2d 210, 212 (Ind.App. 1987). It is well-settled that the "terms of an insurance policy should be interpreted most favorably to the insured if there is an ambiguity in the policy." *Eli Lilly and Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind.1985). The *Eli Lilly* court further explained that "[a]n ambiguous insurance policy should be construed to further the policy's basic purpose of indemnity." *Id.* An exclusion will only be given effect if its language unmistakably brings the act or omission within its scope. *Evans v. National Life Acc. Ins. Co.*, 467 N.E.2d 1216, 1218 (Ind.App.1984). That is, unless the exclusion clearly and unmistakably brings within its scope the particular act or omission that will bring it into play, the exclusion will be ineffective to exclude or destroy coverage. *Asbury v. Indiana Union Mut. Ins. Co.*, 441 N.E.2d 232, 242 (Ind. App.1982).

The "Description of Hazards" portion of the declaration sheet which Granite State advances as the only support for its assertion that no coverage exists herein, is ambiguous and confusing in the use of the word "hazard." The term hazard is never defined in the insurance policy. It appears in several different locations on the declaration sheet. See Exhibit A. (A copy of the declaration sheet with emphasis added). The Granite State declaration sheet provides at the top in a preamble sentence: "[i]nsurance afforded is only with respect to such of the following coverage parts and hazards thereunder as are indicated by an 'x' in the applicable box(es) and by code numbers and premium bases or as indicated by form number and identity on POP–202." About halfway down the page on the right side of the page the term "hazards" appears with a listing of the six constituent coverages of Granite State's comprehensive general liability insurance; premises—operations, escalators, completed operations, products, independent contractors, and premises—purposes of use. On the left side of the declaration sheet about halfway down the page there is a "Description of Hazards" section. It is the third location of the term hazard on the page. Finally, the term hazard appears in the phrase at the bottom of the declaration sheet which provides "[a]s respects comprehensive general liability insurance, the foregoing discloses all hazards insured hereunder known to exist at the effective date of this policy, unless otherwise stated herein." The testimony of both the plaintiff's underwriting witness, Richard Woolman, and the defendant's underwriting witness, Malcolm Carroll, acknowledges that the term hazard is not defined in the policy and that it is subject to different interpretation and may have different meanings in its various uses on the declaration sheet.

When an undefined term is used in more than one location in an insurance document and it potentially has several different meanings, even on the same page, it surely qualifies as ambiguous for purposes of determining coverage of an insurance policy. Ambiguity is judged by considering whether reasonably intelligent people could honestly differ as to the meaning of the term in the policy. In this instance, Granite State's own underwriting witnesses testified that the term hazard has different meanings within a single page of the policy and that the meanings were evident from the context of the term in the policy. How-

ever, "hazards" is not defined in the policy and the conclusion of one expert as to the meaning of a word in different locations is not attributable to all laymen. It is possible that the insured would reach the same conclusion as to the meaning of the term; however, it is also as reasonably possible that the insured would reach a different conclusion as to the meaning of the term or reach no conclusion as to its meaning. Because the term hazard potentially has a different meaning in each of its locations on the declaration and because it is not defined in the policy, it has no apparent meaning. Therefore, it is ambiguous in that reasonably intelligent people could differ as to the meaning of the term or at least be uncertain as to its meaning in a particular location. The ambiguity in this case must be construed in favor of the insured, with the purpose of furthering indemnity. The purported exclusion is ineffective to defeat coverage in this instance because its language does not clearly and unmistakably define the scope of the exclusion. It does not limit the completed operations coverage of the Granite State policy to the risk associated with the construction of private residences.

## II. Prerequisites for Contribution

Granite State also asserts that Indiana has not satisfied the prerequisites for contribution in this case. Under Indiana law, it is well-settled that before there is a right of contribution between insurance companies providing concurrent coverage, the policies must cover (1) the same parties, (2) in the same interest, (3) in the same property, (4) against the same casualty. *Indiana Ins. Co. v. Sentry Ins. Co.*, 437 N.E.2d 1381, 1388 (Ind.App.1982) (citations omitted). Granite State's principal argument in this respect is that because the Granite State policy contains completed operations coverage and the Indiana policy does not, the two policies do not cover the same casualty.

The insurable interest in a liability insurance policy "is the interest the insured has in the safety of those persons who may maintain, ... suits against him in case of their injury...." M. Rhodes, *Couch on Insurance* § 24:160 (2d ed. 1984). The insurable interest of the Hatfields under the Indiana comprehensive general liability insurance policy is the safety of persons who may maintain suit against them for injury arising out of their management of the Regency Complex. Under the Granite State policy, the Hatfields' insurable interest is the safety of those who might sue them for injury associated with the construction and development aspect of their business, including negligent design and construction claims for the Regency Complex.

The two policies in this case insure the same interest, in that each policy provides indemnity coverage in the event of a liability claim arising out of a covered risk. The policies also cover the same parties, the Hatfields, albeit in different capacities in the same property, the Regency Complex. Indiana's coverage of the Hatfields arises out of their management of the complex. Granite State's coverage arises out of their construction and development of the complex and out of the status of the complex as a completed operation.

Finally, Granite State asserts that the two policies do not insure against the same casualty and therefore, Indiana is prohibited from obtaining contribution from Granite State. However, identity of casualty or risk does not require identity of coverage under the applicable policies as Granite State seems to suggest. "The requirement that there be an identity of risk does not mean that the total coverage under both policies be the same, but only that with respect to the harm suffered there be coverage under both policies." *Kirkland v. Ohio Cas. Ins. Co.*, 18 Wash.App. 538, 569 P.2d 1218, 1224 (1977).

This position is supported by the Seventh Circuit's decision in *Home Ins. Co. v. Certain Underwriter's at Lloyd's of London*, 729 F.2d 1132 (7th Cir.1984). In *Home Ins.* an explosion occurred at a Powerine Oil

Company. The source of the blast was a Lomax Hydrocracking Unit designed by Universal Oil Products (UOP). A Powerine employee was injured in the explosion and sued UOP alleging negligence in design, assembly, control, manufacturing, construction, repair, testing and maintenance. Home Insurance sold a comprehensive general liability policy which was excess over a Royal Indemnity Co. policy. The claim was settled for $390,000. Royal Indemnity paid its limits of $100,000 and Home Insurance paid the remaining $290,000. Home brought a contribution action against the British Insurers who had issued an Architects and Engineers Professional Indemnity policy to UOP.

The *Home Ins.* court reasserted the general principle that: "an equitable action for contribution lies when one insurer pays a debt shared by other insurers. There can be no possibility of contribution where only one policy covers the particular loss sustained or liability incurred." *Id.* at 1134 (citations omitted). The British Insurers admitted that to the extent that the settled claim was based on a negligent design theory there was exposure under the professional indemnity policy. However, the British Insurers maintained that Home had to prove the portion of the settlement apportioned to the design claim. The court responded as follows:

> [i]t is plain that the British Insurers are asking the impossible. Home paid $290,000 to settle this case; there is no way to divide this figure into constituents representing [the plaintiff's] "design" theory, "manufacturing" theory, "construction" theory, and the like. Indeed the case is in the same posture as if a general verdict had been returned in favor of [the plaintiff].

*Id.*

One explosion caused one set of damages in the *Home Ins.* case. The court noted that it was permitted to assume after settlement that the plaintiff could have prevailed on his design claim; therefore, the insurers had the same maximum exposure in the suit.

The case at bar is similar to *Home Ins.* Granite State does not admit exposure under the design and construction theories of the plaintiff's negligence action. However, the court has determined that the Completed Operations Coverage of the Granite State policy affords coverage herein. As a result, under the reasoning of *Home Ins.*, Granite State is responsible for a share of the settlement. The court is permitted to assume that Snider could have prevailed on his claims of negligent design and construction. The case is in the same posture as if a general verdict had been rendered. Although, the two policies in this case insure against competing aspects of Snider's liability claim, they nonetheless both insure the indemnity interest of the Hatfields for a liability claim arising in conjunction with the Regency Apartments.

The Snider claim was settled for $1,000,000 at a point when Snider was asserting negligence in design, construction, maintenance, and operation of the outdoor swimming pool at the Regency Apartments. According to *Home Ins.*, the court is entitled to assume that the plaintiff could have prevailed on any of the theories still pending at the time of settlement. Therefore, Granite State has exposure under its Completed Operations Coverage for the Snider claim which is concurrent with Indiana's coverage of the claim under its Premises Coverage. The policies do not provide the same coverage, however, the same casualty or risk is insured in each, that of indemnity for liability claims. The prerequisites for contribution have been satisfied in this case and Granite State must contribute by equal shares pursuant to the "other insurance" provisions of both policies.

## III. Risk Allocation

In a final attempt to avoid contribution in this case, Granite State maintains that contribution is foreclosed by Indiana precedent which provides that where insurance is purchased pursuant to an agreement, the risk of loss is shifted away from the parties to the agreement and the insurance company

accepting that risk is not entitled to receive contribution from the negligent party's insurance company. *American Underwriters, Inc. v. Auto–Owners Mut. Ins. Co.,* 719 F.2d 900 (7th Cir.1983); *South Tippecanoe School Bldg. Corp. v. Shambaugh & Sun, Inc.,* 182 Ind.App. 350, 395 N.E.2d 320 (1979); *Morsches Lumber, Inc. v. Probst,* 180 Ind.App. 202, 388 N.E.2d 284 (1979).

The *Morsches* decision is instructive on the issue of when contribution will be foreclosed by the existence of an agreement. Morsches Lumber entered into a construction agreement with defendant, Probst, to build a cattle pole barn. Pursuant to the agreement, Probst carried fire and windstorm insurance and Morsches carried compensation and liability insurance. The barn was destroyed in a windstorm and at trial Morsches' negligence in the construction of the barn was determined to be the proximate cause of the barn's destruction. The policy procured by Probst covered only about 75% of the loss. Probst brought an action against Morsches to recover the difference. Morsches argued that the agreement to purchase insurance constituted an agreement to limit recourse in the event of loss solely to that policy irrespective of which party's negligence caused the loss. The *Morsches* court said:

> the better reasoning is found in those cases holding that an agreement to insure is an agreement to provide both parties with the benefits of insurance. Individuals understand that insurance will protect them against the consequences of their own negligence and more than likely assume that if one who is a party to a contract agrees as part of his or its duties to provide insurance,

that the insurance will protect both of them regardless of the cause of the loss (excepting, of course, wanton and willful acts). If that were not their intent, each would provide his or its own insurance protection and there would be no need for the contract to place the duty on one of them.

*Morsches,* 388 N.E.2d at 287.

The effect of the agreement is to shift the risk of loss away from the parties to an insurance company in exchange for a premium payment. "Neither party intends to assume a potential liability; rather both are demonstrating 'normal' business foresight in avoiding liability and allocating it to an insurer." *Id.* (citation omitted).

These cases have some applicability to the case at bar; however, they do not defeat Indiana's contribution claim. The management agreement in this case appears to require the Hatfields to purchase insurance to cover the Regency Complex, with Regency Associates as named insureds and the Hatfields as additional insureds. Thus, there is some evidence that the risk in this case arising out of the ownership, management, operation, and maintenance of the complex was allocated to Indiana for the benefit of both Regency Associates and the Hatfields. That is, the agreement seems to allocate risks which are common to the parties to the agreement, those which arise out of ownership and management.

■ However, in this case a separate and distinct liability claim is being asserted against the Hatfields in their capacity as builder/developers.[3] The complaint included a claim of negligence in the design and construction of the swimming pool.[4] The

---

**3.** It should be noted that this discussion concerns a different issue than the question of whether the two companies insure the same casualty discussed *supra.* at pp. 1558–59. Identity of casualty coverage relates only to the insured interest, not to the type of cause of harm. This discussion relates to unshared risks arising out of a property where there is an identity of insurance against casualty.

**4.** The defendant asserts that the case of *Snider v. Bob Heinlin Concrete Const. Co.,* 506 N.E.2d 77 (Ind.App.1987) established that as a matter of law there was no design or construction defect in the pool. However, the defendant's reliance on that case is misplaced for two reasons. First, the case does not actually find that there is no defect in the pool. The court found that in order to impose liability on the independent contractor, after acceptance of the work by the

case law regarding risk allocation has not been construed so broadly as to allocate a risk which the parties do not share. In this case, the Hatfields were exposed to liability on the negligent design and construction claims. There is no basis for liability on this aspect of Snider's claim against the owners of the complex. This risk is an independent exposure, wholly distinct from those common exposures allocated by the agreement. The case law which the defendant cites has not been and should not be read so expansively as to defeat coverage under the Granite State policy, a decision having the effect of eliminating insurance coverage on that claim altogether. The Hatfields acquired the insurance to protect themselves from liability on a claim which was exclusive to them as builder/developers of the swimming pools and that protection is not properly forfeited by an agreement allocating a distinct risk.

Because the court is entitled to assume that Snider could have prevailed on his claim of negligent design and construction, Granite State had the same exposure as Indiana for the Snider claim. *Home Ins.* at 1134. The Hatfields purchased insurance to protect themselves from liability claims associated with their construction and development business. The Hatfields paid a premium for that protection and the fact that they were parties to an agreement which allocated separate and distinct risks, namely those arising out of the management of the complex, to an insurance company, has no effect on the applicability of the Granite State policy to the design and construction claim.

## IV. Conclusion

Granite State provided coverage for the Hatfields and the risks associated with their construction and development business. The Snider claim falls within the

Completed Operations Coverage of that policy. The fact that there was an allocation of a different risk associated with the same property is of no consequence in this case. The Granite State policy affords concurrent coverage for the Snider claim and Indiana has satisfied the prerequisites for contribution. Therefore, Indiana is entitled to contribution by equal shares for the settlement and to contribution of one half of the attorney's fees and expenses associated with the defense of the Snider claim.

Because this court finds merit in the plaintiff's contribution claim, it does not reach the plaintiff's estoppel argument. In addition, the plaintiff's request for prejudgment interest is DENIED. "Under Indiana law prejudgment interest is proper when damages are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time damages accrue." *Simmons, Inc. v. Pinkerton's, Inc.*, 762 F.2d 591, 607 (7th Cir.1985). In this case the damages were personal injury damages which typically do not fall within the established fixed and ascertainable standard. In addition, Indiana has failed to cite to any cases which have extended the award of prejudgment interest to a situation such as this one. Therefore, this case falls within the general rule proscribing prejudgment interest in personal injury actions and prejudgment interest is not ordered. Judgment will be entered in accordance with this entry.

## ENTRY

## ON MOTION FOR NEW TRIAL AND MOTION TO AMEND

This cause comes before the court upon the defendant's Motion for a New Trial and the plaintiff's Motion to Amend Judgment. The court having reviewed the motions and memoranda submitted therewith hereby

---

owner, negligence in the construction is not sufficient. The negligence must create an inherently or imminently dangerous situation in order for the independent contractor to be liable to a third party. *Id.* at 81–82. Second, this case was not decided at the time that the settlement

was effectuated in this case. Therefore, even if the case did foreclose the finding of a design defect, it had not done so at the time of the settlement herein and the settlement is properly considered in the same vein as a general verdict.

DENIES the defendant's Motion and GRANTS the plaintiff's Motion.

### Background

On January 15, 1988, a court trial was held in this case with the issue being one of determining whether Indiana was entitled to contribution from Granite State for a personal injury settlement arising out of a swimming pool accident. On May 2, 1988, this court entered judgment in the amount of $508,407 against Granite State and filed its Entry explaining in detail the rationale behind the decision. On May 12, 1988, the defendant filed a Motion for a New Trial alleging that the court erred in its finding that the Granite State policy afforded coverage to the *Snider* claim and thus that Indiana was entitled to contribution from Granite State for the *Snider* settlement in light of policy language providing for contribution by equal shares when concurrent coverage is provided by two insurance companies. On the same day, the plaintiff filed a Motion to Amend Judgment to award the accurate amount of attorney's fees and costs associated with the settlement of the *Snider* claim and to award prejudgment interest.

### Discussion

In its Motion for New Trial, the defendant asserts that the court's finding that the *Snider* claim fell within the completed operations coverage of the Granite State Comprehensive General Liability Policy was erroneous. In support of its assertion the defendant advanced the trial testimony of the plaintiff's expert witness, Richard Woolman, that the apartment complex became a product rather than a completed operation upon its sale and a conclusory statement that the finding of coverage is inconsistent with the policy definition of the phrase "completed operation." The defendant's argument is wholly insufficient to cause the court to grant a new trial. The reasoning behind the court's decision regarding coverage is found in pages 1555–56 of the court's May 2, 1988, Entry.

The court did not rely on the testimony of Richard Woolman in making its determination that the Granite State policy afforded coverage to the *Snider* claim. Further, this court is not bound by his conclusion that the sale of the complex changed the risk from a completed operations risk to a product risk. In making the determination that coverage was extended to the *Snider* claim under the completed operations coverage of the Granite State policy, the court analyzed the relevant policy language. The policy provides that an operation is deemed completed "when all operations to be performed by or on behalf of the named insured at the site of the operations have been completed" or "when all operations to be performed by or on behalf of the named insured under the contract have been completed." In addition, the completed operations coverage has, as a condition of applicability, that the bodily injury or property damage occur away from premises owned or rented to the named insured. At the point when the complex was sold by the Hatfields, they, as named insureds had performed all of the functions associated with being the general contractors of the complex and swimming pool; thus, the operation was completed. Further, upon the sale, the named insureds, the Hatfields, no longer owned the premises. Therefore, the *Snider* bodily injury claim which occurred within the 90–day period of automatic coverage for newly-created risks was afforded coverage. That is, the claim arose during the effective date of the policy and it occurred at premises away from those owned or rented by the named insured at a point when the operations of the Hatfields with respect to design and construction of the pool had become "completed" within the meaning of that term in the policy. The defendant has failed to cite authority for its proposition that the court's finding that the Granite State policy afforded coverage to the *Snider* claim was erroneous. The court having reviewed defendant's argument and the entry of May 2, 1988, finds the defendant's position to be without merit and hereby DENIES defendant's Motion for a New Trial.

On May 12, 1988, the plaintiff filed a Motion to Amend Judgment. In that motion, the plaintiff seeks to alter the amount of the attorney's fees awarded in the May 2, 1988, entry of judgment to accurately reflect one half (½) of the actual attorney's fees, costs, and expenses associated with the settlement of the *Snider* claim. The court acknowledges that at trial the parties stipulated to the reasonableness of the fees and costs submitted by the plaintiff of $33,627.74. In addition, the court acknowledges that based on the co-existing duty to defend, Granite State is properly assessed 50% of that figure. The $8,407 awarded by the court in the judgment was a miscalculation of the actual amount properly attributable to the defendant, Granite State. The amount of the judgment should and will be amended to reflect the actual amount due, namely $16,813.87.

Finally, the plaintiff asserts that the judgment in this case is subject to an award of prejudgment interest. Upon review of its entry, the court finds that plaintiff's position has merit and therefore GRANTS plaintiff's Motion to Award Prejudgment Interest. It is settled in Indiana that an award of prejudgment interest is "proper when the damages are ascertainable in accordance with fixed rules of evidence and accepted standards of valuation at the time the damages accrued." *Indiana Indus., Inc. v. Wedge Prod.*, 430 N.E.2d 419, 427 (Ind.App.1982). The *Indiana Indus.* court further noted that "the 'ascertainable' standard is in reference to the amount of damages as distinguished from the liability for those damages." *Id.* The court in *Courtesy Enterprises, Inc. v.*

*Richards Labs*, 457 N.E.2d 572 (Ind.App. 1983) further explained the fixed and ascertainable standard by saying that "[t]he test is not whether the parties have mutually fixed the amount in dispute; rather, the question is whether the principal amount is ascertainable by mere computation." *Id.* at 580 (citation omitted).

In the instant case, at the time that Granite State agreed to the reasonableness of the settlement amount of $1,000,000, the company knew that its exposure was $500,000 plus one half of the attorney's fees and costs associated with the settlement of the *Snider* claim. The contribution action is, as the plaintiff properly noted in its motion, separate and distinct from the underlying personal injury claim. When this action was filed, Granite State's exposure, if liability was found to exist, was fixed and ascertainable. The damage amount in the contribution action was "ascertainable by mere computation" at the time that settlement was effectuated. That is, at the time of settlement damages in the amount of $500,000 pro-rata contribution for settlement plus $16,814.87 of attorney's fees and costs had accrued to the defendant, Granite State, in the event that liability for contribution was found to exist.

Pursuant to Ind.Code § 24–4.6–1–103 prejudgment interest in the amount of 8% per annum shall be entered on the total amount of the judgment entered against Granite State, namely, $516,814.87 from the date of the settlement of the underlying claim, January 23, 1986, until the date of entry of the amended judgment in this action.

EXHIBIT A

## SCHEDULE OF GENERAL LIABILITY HAZARDS

Attached to and forming part of Policy No.

POP__280-22-39

**AND LIMITS OF LIABILITY WHEN EITHER DRUGGIST LIABILITY OR STOREKEEPERS INSURANCE ARE APPLICABLE**

NEW HAMPSHIRE INSURANCE GROUP

S E C II S C H E D U L E

INSURANCE AFFORDED IS ONLY WITH RESPECT TO SUCH OF THE FOLLOWING COVERAGE PARTS AND HAZARDS THEREUNDER AS ARE INDICATED BY AN "X" IN THE APPLICABLE BOX(ES) AND BY CODE NUMBERS AND PREMIUM BASES OR AS INDICATED BY FORM NUMBER AND IDENTITY ON POP-202.

| COVERAGE PARTS | PREMISES |
|---|---|
| [X] COMPREHENSIVE GENERAL | LOCATION OF ALL PREMISES OWNED BY, RENTED TO OR CONTROLLED BY THE NAMED INSURED (SAME AS ITEM 1 OF PART B UNLESS OTHERWISE INDICATED BELOW) |
| [ ] MANUFACTURERS' AND CONTRACTORS - WITHOUT IND. CONTR. | |
| [ ] OWNERS', LANDLORDS' AND TENANTS - WITHOUT STRUCT. ALT. | DESIGNATION OF INSURED PREMISES (SAME AS ITEM 1 OF PART B UNLESS OTHERWISE INDICATED BELOW) |
| [ ] DRUGGIST   LIMITS OF LIABILITY   COV L   EACH CLAIM $ _____   AGGREGATE $ _____ | |
| [ ] STORE-KEEPERS INSURANCE   LIMITS OF LIABILITY   COV T   COVERAGE S $ _____   EACH PERSON $ _____   EACH ACCID. $ _____ | LOCATION OF COVERED OPERATIONS AND DESIGNATION OF CONTRACTOR AND MAILING ADDRESS (INDICATE BELOW) |

| DESCRIPTION OF HAZARDS [INDICATE APPROPRIATE HAZARD NO(S).] | CODE NO. | PREMIUM BASES | HAZARDS |
|---|---|---|---|
| 3) Completed Operations:<br><br>Carpentry in the construction of detached private residences for occupancy by one or two families and private garages in connection therewith          316-17535 | j | 100,000. | 1. PREMISES-OPERATIONS<br>2. ESCALATORS (Number at Premises)<br>3. COMPLETED OPERATIONS<br>4. PRODUCTS<br>5. INDEPENDENT CONTRACTORS<br>6. PREMISES-PURPOSES OF USE |

| PREMIUM BASES | RATES |
|---|---|
| a. Area (Sq. Ft.) | Per 100 Sq. Ft. of Area |
| b. Frontage | Per Linear Ft. |
| c. Payroll* | Per $100 of Remuneration |
| d. Escalators (No. of Landings) | Per Landing |
| e. Total Cost* | Per $100 of Cost |
| f. Units | Per Unit |
| g. Admissions* | Per 100 Admissions |
| OLT, MC. | |
| h. Receipts* | Per $100 of Receipts |
| i. Sales* | Per $100 of Sales |
| COMPLETED OPERATIONS, PRODUCTS AND DRUGGIST | |
| j. Receipts* | Per $1,000 of Receipts |
| k. Sales* | Per $1,000 of Sales |

AS RESPECTS COMPREHENSIVE GENERAL LIABILITY INSURANCE, THE FOREGOING DISCLOSES ALL HAZARDS INSURED HEREUNDER KNOWN TO EXIST AT THE EFFECTIVE DATE OF THIS POLICY, UNLESS OTHERWISE STATED HEREIN;

